All right. We have four argued cases before the Court this morning. The first case is 15-1295, Hill-Rom Services v. Stryker Corporation. I understand that, Mr. Leach, you want to save five minutes for rebuttal. Is that correct? That's correct, Your Honor. Okay. You may begin. Thank you, Your Honor. May it please the Court, my name is Garrett Leach. I represent the appellant, Hill-Rom, in this particular matter. This appeal relates to obviousness under 35 U.S.C. 103. Mr. Leach, speak up a bit. Yes, Your Honor. Sorry about that. There's no dispute that the art at issue here falls into two separate categories. You've got hospital beds on the one hand and controller area networks, or CANs, on the other hand. There's also no dispute that the prior art never puts those two things together. The first company ever to do so was my client, Hill-Rom. So the real issue here is that the question Well, if you take the art the way you've described it as hospital beds as opposed to medical devices, if you take it as medical devices, then it had been put together, I guess. Medical devices and CAN had been put together, yes. But if you define it just as hospital beds, then I guess Correct, Your Honor. And that'll be part of what I'll get into is whether or not how we define those broad categories because in some instances you could define a category so broad that you could pretty much incorporate whatever you want into it. And we think that's kind of what happens here, unfortunately. Would the lounge seat that a lot of people have in their TV room that has an operator and it goes back and sometimes even vibrates and has all those adjustments, that's not the same art? Is that what you're saying? No, what I'm saying is medical devices on a whole have a lot of different arts in them and can be very different from a catheter to a pacemaker to a hospital bed. That's why the medical device category doesn't seem as analogous as the classic lounge chair in everybody's TV room. Correct, correct. And here the reason that these two references were combined is because, and really the only reason that the PTAP cites two is because it says CAN was used on other medical devices, not lounge chairs or beds or anything like that, but other medical devices such as an x-ray machine or as I said, maybe a pacemaker, a catheter. There's such a broad range of things you could call medical devices. How does your controller functionally differ from the controller that operates the lounge chair? Functionally differ. I guess I don't want to get into factual issues. I'm not that aware of how it works on a lounge chair or if there are even CAN networks on lounge chairs, but there are certainly different aspects to a hospital bed such as a scale, such as the different ways the bladders raise and lower the patient that I think would be very distinct from a lounge chair. These hospital beds, and my client here can tell you this, are very complex devices that require a lot of different functionality for the safety of the patients, and they have to, unlike other medical devices, oftentimes they have to run on their own. There's not somebody there using it, a doctor who's working it. It's a patient laying in a bed overnight. It has to adjust if things happen. That was my other question if I may ask it while you and I are having a little dialogue. Does this item called a controller area network, that's a fancy description for the way you operate your bed. That doesn't go down to the doctor's office or to the nurse's station, does it? The controller area network does have functionality that goes back and sends messages, and that's part of the unique aspect of putting it into a hospital bed that had never been done before, is before you had a situation where you could implement and do things one at a time. Like you could have one button that did the feet went up and down, another button that weighed the patient. This allows there to be interaction between the various modules on the bed and be able to replace modules without having to rebuild the whole bed. So it really was a revolutionary change in hospital beds, which may not sound that revolutionary, but to people that deal in hospitals it was important. Why wouldn't a person of ordinary skill, and we may be getting a little bit ahead of ourselves and peeking at the second case, but why wouldn't such a person not naturally look to a reference such as Hines, the x-ray machine, but in particular with respect to the Hines functionality of moving the table in multiple directions, the table on which the patient sits or lies. That sounds very familiar, similar to me, to the functionality of moving a hospital bed up and down and so forth. That is one aspect of the hospital bed. And it uses cotton. Hines does use cotton, yes, that is one aspect of Hines, and certainly if that's all that a hospital bed was, it was just moving things up and down, then I think there would be a little bit more merit to that argument. Now the fact of the matter is, nobody still put those two together, and despite efforts even by our opponent, Stryker, to do so, they had to go out and get them. But that's always true in an obviousness case that isn't anticipation. You obviously have a situation where no one's actually put them together. The question is, would it have been obvious to a person to do so? Correct, correct. And there, as I said, in a hospital bed you've got many other modules other than just raising and lowering. I mean, you do have the articulation, which is going to be very different from the x-ray device. And really, if you look at Hines, what it was focused on was this wireless transmission. So someone looking at that reference wouldn't say, wow, I need to put CAN into a hospital bed to work on all these other functionalities. They'd say, maybe if I wanted to do something wireless, that would be the reason I would choose that, or I'd choose the wireless functionality. When we're talking about a motivation to combine them, the fact that things weren't put in a hospital bed before is because nobody ever used a hospital bed to do anything other than possibly sit up. In other words, this is a new thing of having all this functionality in a hospital bed. But that doesn't necessarily mean that there wouldn't be a motivation to look to the prior art to see what systems were used to implement these new kinds of things that you want to implement in the bed. Let me just be clear. The functionality was already there. They were using old network systems to use that functionality that was less useful, and it was the invention of putting the CAN into the bed. So functionality didn't come along and they said, how are we going to do this? It was already existing. The hospital beds before this patent and this invention had all that functionality that this invention assumes. There's nothing new in terms of being able to bring it back up. Correct. The claims do not add anything. There's nothing new about weighing the patient, although it may have been done on a scale that was not part of the bed. So what is new and dramatic? It was the combination. As this court has found, almost every invention is a combination of old things. Yes, my saying that we came up with some brand new light bulb or something, no. It certainly is a combination of two things, but it was a combination nobody had ever done and nobody had ever thought to do. In fact, part of what the PTAC has to do… Combination of the bed known functionality with this controller area network, but wasn't the functionality of the controller area network already known? It was for certain devices, but not for these types of devices. That's correct. But you don't dispute that it would be appropriate to conclude that a person might look at the other devices when deciding what kind of network to use. Correct. I don't dispute that they could look at that. Really, this isn't as much a motivation to combine question in my mind as it is, would one of skill in the art have been able to put a can onto a hospital bed? If they looked at that, would they have been able to do that? Would they have been able to implement that? That's precisely the question that the PTAC looked at in deciding this issue. You're saying it goes to reasonable expectation of success? Correct, yes. Whether they could have done it was really the question, and this is addressed in the PTAC's opinion. I think this entire appeal on this particular case comes down to these two pages of the opinion, which are A221 and 222, where they specifically set out the hypothetical person had knowledge to implement a can in a hospital bed, and said right off the front, the question in dispute is whether the hypothetical person would have the knowledge to implement a can in a hospital bed. That's the question we're faced with here today. When they addressed that, they went through the evidence, and the only evidence that they cited to was the fact that it had been done on other medical devices, like an x-ray machine. They didn't have any other evidence. In fact, when pushed, and we pointed out evidence where Stryker had to use an expert to do this, they said, well, that's okay. One of skill in the art can go consult with experts, which we know is not the law. That's not a person of skill in the art. A person of skill in the art has the knowledge they have. Certainly they can go retreat it. Well, I think at least your friend on the other side is going to argue that that's not exactly what the board said. What the board said is the fact that he consulted with the expert doesn't change what the normal level of skill in the art is. In fact, a particular person may have consulted with an expert because the board concluded that they did it just to save money and time, right? That's what the board concluded, which I have dispute with. That's really what it says. It was more of a marketing piece by the company. But more importantly, what the board actually said was that Mr. Hayes' consultant with a design firm with canned expertise, and this is at the end of the quote, is a source of the hypothetical person's knowledge. So they're reading the law. You're reading at 221, 222? At the bottom of 222, Your Honor. Bottom of 222. Okay, thanks. Where it says this is a source of the hypothetical person's knowledge. To me, that would be new law. You can go see an expert as a source of the hypothetical person's knowledge. You can fill in any hole in it. Really, we might as well not even have a person's skill in the art definition, if that's the case. You're confusing me just a little bit. I thought that the concept of obviousness asks the question, would one of ordinary skill in the art have conceived of this idea, this invention? I didn't think it asked the question, could that individual have been able to successfully implement the invention for manufacturing purposes? Am I correct? In part, Your Honor. I think the real question, though, in the analysis is whether, when you look to see whether they conceived of it or could have conceived of it, would they have been able to do it? Well, that's a separate question, isn't it? Would they have actually been known where to put the screwdriver and how many fuses it would need? Isn't that a separate question? I think that's not the detail I'm looking at. I'm saying just even in general how to put these two things together. If they're unable to do that, I think that gets to the question of whether they could have conceived of it, because they wouldn't think to do it if they wouldn't be able to implement it. And there must be some evidence to show you can just simply find references over here, find references over here, and that somebody would have just magically known how to do that. Now, in hindsight, great, we have hospital beds. We've had them for 15 years that have can on them, but that's because our client came up with a way to do that, and now after spending all the money on prosecution, development, enforcement, we've got the PTAB without evidence coming in and saying, sorry, you don't have a patent anymore. But in terms of what the person of ordinary skill or anyone that's implementing the invention had to know how to do, we look to the claims, right? And the claims, if you look at claim one, that's as complicated as the actual Hill-Rom Hospital bed may be. Claim one is anything but complicated. It just says a can system with a bed comprising a mattress having one bladder, and a pressure control system which operates to inflate and deflate the bladder, and a can system. And the dependent claims don't add too much more. So you've really just got, all you need is a person of ordinary skill could come up with using a can to inflate the bladder to move the mattress, right? And that would be enough to enable that claim. Well, and I think it's a question of enablement versus ability to put them together. Just because the claim is broad doesn't mean that someone of skill in the art would have known how to implement the two together. No, but in terms of what the person of skill in the art would have had to know how to implement, that's all they would have had to know how to implement, right? Well, they would have to go to the specification and figure out, based on the disclosure in the specification, how to do that implementation. But yes, they only have to know how to implement those two things as described in the claim. My point is the specification then teaches you how to do that in a hospital bed. So yes, it looks like hospital bed can put those together, but you still have to be able to do that. And even though the claim doesn't teach you per se how to do that, it's a broader claim. The specification does. I've gone way past my time. We'll restore three minutes of rebuttal, and we'll give your opponent an extra two minutes. Thank you, Your Honor. Aren't you glad you prepared an argument for us? I am. May it please the Court, Robert Surratt on behalf of Stryker Corporation. The PTAB's rejection of all claims in reexamination of the 390 patent, as obvious, should be affirmed. In reaching its decision, the PTAB made factual determinations regarding the level of ordinary skill in the art, whether one of skill in the art could implement, and whether there was a reasonable expectation of success in implementing CAN on a hospital bed. Substantial evidence supports these factual findings. And before I turn to those specific findings, I'd like to kind of address some of the issues that came up during opening argument here. Hillrun made the point on opening argument that the priority that existed at the time was hospital beds and CAN, medical devices with CAN. And that's somewhat imprecise in the sense that it was hospital beds with networks existed and CAN. And all of the functionality that Hillrun described during the opening about the ability to control modules on the bed, that was in the prior art. That came from Kummer. Kummer is the primary reference, or one of the primary references. That's in the art already. CAN is just another type of network to use on a bed. So if you think about it, and Judge Bryson, you raised the issue of the claims, the claims are directed towards a hospital bed with CAN. What existed prior to this patent were hospital beds with networks and medical devices across various types. Networks, is that basically what the prior art was? Well, actually, the prior art was a peer-to-peer network, I believe. I guess Travis, which is a more of an issue, I guess, in the second case. But nonetheless, it's a prior art that's referenced in this case. So remind me what type of network Travis had. Travis was a peer-to-peer network. No, I didn't think so. I think that was the problem in the other case. But it had some kind of network, a master-slave type network, right? It had functionality. And so it had the functionality to control modules, and that's what existed at the time. And as the peak time found it would have been obvious for one of skill in the art here to look to CAN and its use in other medical devices and implement it on a hospital bed. Part of my problem with your argument is, and what the board did, is I think that your opponent points out pretty clearly a series of errors by the board. Like it's pretty clear the board shifted the burden in many ways and required opponents to disprove points with respect to obvious net rather than the other way around. And I also don't see this as a simple substitution case, which the board tried to peg this into. So the question is, despite those errors, is there a way to say that the board ultimately did do a proper motivation to combine analysis? And because simply saying that because there was a network and because CAN happens to also have been a network that was used in other things, that that's enough. I don't think that's enough for purposes of the board finding a motivation to combine. So why don't you point to me where you think the board actually found the motivation to combine. On pages A-207 of the appendix through It goes on for quite a ways. It goes through A-215. That's where the board is talking about combining Kummer with CAN publications, and that's where the motivation to combine. As the board found, the motivation doesn't have to come from the references themselves. It can come from the art. And when you looked at what was available to one of skill in the art, you had a hospital bed with a network and you had CAN. And in trying to address the issues of problems of what existed at the time, CAN provides solutions to those problems. But you're trying to defend the extent to which the board relied on a simple substitution theory. And given the complexities of what's at issue here, I don't think that's enough. And so my question is, where did the board then say beyond the question of, well, there's a network here and there's a CAN here and we'll just put one on top of the other. Where did the board actually find a motivation to combine the two that would have taken the prior system, the prior art system, Kummer, with the network and combine it with the CAN? Well, the board looked to the declarations of Stryker, Mr. Hayes and Professor Kolkin, where they outlined that implementing CAN on a hospital bed had the same types of routine design choices that one would face in implementing any network on a bed. And Judge O'Malley, I guess I would have to disagree with you that there was a shifting of the burden. I think if you looked at what happened is the PTO established a prima facie case of obviousness and then this burden shifted to Hill-Rom to rebut that and the PTAB found that that was not persuasive. Okay, well, there's no burden shifting in this context anymore, so let's forget about burden shifting. But the problem is that what you're saying is that the PTAB felt that there was something that would just sort of inspire someone to make a simple substitution, but then even the pages that you point to at 212, there's a lot of negative language. In other words, basically saying that Hill-Rom didn't convince them otherwise, didn't convince them that it couldn't happen. And what I'm trying to find is where did the PTAB point to evidence saying that the prior art would indicate that it could? Before you answer that, you have to challenge the premise, don't you, that the prior art has to articulate a possibility that that particular combination could be done? Yeah, the renovation of the combine doesn't have to come from the references. I think that's your point. But that's my point. Where does it come from? It comes from... Isn't the place where the board addresses this really at the top of 210, where the board says, as argued by Stryker, there's considerable evidence that the advantages of CAN have been recognized in the medical device industry? Yeah. And then they say, well, okay, they cite HINES, which is this table that moves by CON. Which is a patient support, actually. And they say, based on findings made by the examiner, that CON is known to have the advantages of speed, reliability, and modularity. And therefore, given those circumstances, they conclude that... That's precisely right. ...it's committed itself to the person of ordinary skill in the art. Yeah. I mean, that seemed to be as close as the board got in discussing that point. Yeah. So if you look at where CAN had been implemented in other industries. It was implemented in an x-ray machine. It had been implemented in an endoscopy suite. Zeltwanger talks about CAN had been implemented in medical devices. Hatchberger, same thing. So I think one of skill in the art would recognize that through these applications and other medical devices, the advantages of using CAN in a hospital bed would be appropriate. And that's where the motivation comes from. So I'd like to talk about this issue of the attribution. That somehow the knowledge of the design firm is attributed to one of skill in the art. And I think it's important to look at the treatment of what happened. So when the PTAB reached its conclusion about the level of skill in the art, the PTAB, in looking at the environmental design factors, did not consider the knowledge of the third-party firm in determining that level. The PTAB did not use or did not consider the knowledge of the third-party firm when determining whether the person of skill in the art could implement CAN on a bed. And this whole issue of the PTAB, considering the knowledge of the third-party firm, came up when evaluating and rejecting an argument that Hillrun made that Mr. Hayes couldn't do it. But the focus shouldn't be on Mr. Hayes. The focus should be on whether one of skill in the art could implement. But you'll concede that the reference to the Hayes Declaration was actually a bit of a misstatement. I mean, it doesn't actually say that the reason he consulted the third-party was to save time and money. He doesn't say it directly, but I think that's a reasonable inference, a reasonable conclusion to draw from it. He doesn't say, the words do not say we hired a third-party firm to save time and money. I think he said that was a result of it, and I think that's a reasonable conclusion. And I think the fact that design firms existed at the time shows that how ubiquitous CAN was at the time. And interestingly enough, I think what Hillrun never points out is what specific knowledge was transferred from this third-party firm to Mr. Hayes or then to a hypothetical person in the art that they would have needed to implement CAN. I think the record evidence is pretty clear from the declarants from Stryker, and particularly Mr. Copeman and Mr. Hayes, that implementing CAN on a hospital bed faced the same kinds of routine design choices implementing any type of network on a bed faces. I mean, isn't your point really that Mr. Hayes wasn't really used by the board as a substitute for the person of skill in the art? Was not. Was not. You get it precisely. Would you be of the view that CAN, the controller area network, was in existence both in concept and in practical use because it was certainly in use in the x-ray field, and that the hospital bed functionality was also in existence? Now, it would appear that putting those two things together is what they are standing on as their invention, and it would appear that nobody else had done that. Are you of the view that somebody could come up with an improvement, let's call it an improvement, that might be a good market tool, that might in fact have a big market, without it actually qualifying as a patent? Is that what your position is? It seems to me they've come up with a pretty good improvement. I don't think what they've come up with is inventive. It's taking the use of CAN, which was used in a variety of non-medical and medical industries for a number of years for precisely the same reasons as being used in a hospital bed, and they stuck it on a hospital bed. But that was an improvement over what had previously been available on a hospital bed. But it's not an invention. Why not? Why doesn't it qualify as an invention? That's the issue before. Exactly, because it would have been obvious. But that's my problem. If we keep coming back around, it's not an invention because it would have been obvious, it's obvious because it would have been obvious. When you say sticking it on a hospital bed, there's nothing in the record that I can see that the board points to to show that there would have been a reasonable expectation of success with the use of CAN in a hospital bed. Well, I think there's plenty of evidence in the record. First of all, Hilram's declarants never point to any unexpected result of using CAN. The fact that CAN was implemented in an x-ray machine, in an endoscopy suite, in other medical devices, demonstrates that it's predictable in terms of the way it works. So there is plenty of record evidence, I think, to establish that there was a reasonable expectation. You're arguing that because they were successful in doing it, they must have had a reasonable expectation then. No, I think if you look very specifically at the Hispana Declaration and the Dixon Declaration, what they talked about is that it was hard to do, that it took a lot of work. That's not invention. That's just routine engineering work that happens every day. When you look at the reasonable expectation of success, multiple groups had implemented CAN in multiple medical applications. Independently, these were not all of the same group. The fact that independent groups with independent medical devices had implemented CAN, and that was in the art, and the one of skill in the art knew that. So the fact that it had been implemented in other medical devices, there's nothing in the record to say you can't use this in a hospital bed. And there was nothing in the prior art that established that using CAN in any of these other applications yielded any unpredictable results. Looks like my time is pretty close to ending. Yes. Anything more? Okay. Okay. Thank you, Your Honor. So CAN was implemented on automobiles at the time of this prior art. An automobile, I think everybody agrees, is a wheeled transport. A bed is a wheeled transport. Under their argument, we could have gone that route instead of the medical device route. I mean, that's the problem with this argument, is the motivation to buy in here is just create a broad category, say somebody did it elsewhere in that broad category, therefore we know how to do it here. I think the question was asked, where did the board find this motivation to combine? One of the answers was from the Hayes Declaration. And then there was a question of whether or not he was one of skill in the art. It's undisputed. We raised the issue that he is more than skill in the art, that Hayes actually is higher level than skill in the art. And what did he do? He went out and hired experts to do this. And we can question whether or not he did that to save time or money, but the fact of the matter is he went out and hired experts to do this, exactly what my client did as part of their invention. What about the portion of the record, though, that Judge Bryce cited, too, on page 210, where the board went through the fact that in the prior art, there was not only use of CAN in medical devices, but there were several articles and other teachings that talked about how CAN functions and how designers can implement the technology. And if you look at those articles closely, Your Honor, what you'll see is just very cursory indications that they could be used in the medical field. Some of them even say they're still being developed for the medical field. Not one of those references mentions anything about a hospital bed or anything close to what a hospital bed would be. And so it's really the same argument that they then fall back on at page 221 and 222 when they make this conclusion that they could have combined this. And again, when you look at those two pages, the only evidence is they're all in this broad medical device category. And then since we can't find anything else, we're going to turn the tables and now have Hilrom explain to us why this would be any different on a hospital bed. Well, I thought the board had gone to KSR for guidance on this very question. If you go back to 207, the board said basis for combining Kummer with CAN publications. Correct. And what the board said was they were quoting from KSR. The court held that the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results. Yes. And then KSR goes on to say to make this determination, the court explained it will be necessary to look to interrelated teachings of multiple patents. And the background knowledge possessed by a person having ordinary skill in the art. All in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent. Well, the apparent reason was this particular group, presumably of skill in the art, looked at the technology of CAN. They looked at the hospital bed and they said, well, what would happen if we plugged CAN into a hospital bed? Isn't that what KSR is really asking us? KSR, that is the law in KSR. The problem is you actually have to have evidence to show that. KSR also goes on to say unless its actual application is beyond a person's skill in the arts ability. And it's our position that the PTAP had the burden to show that it was. And we, I think, presented evidence of somebody of more skill in the art at Hays who couldn't implement it. They didn't provide any evidence that someone actually could put these two things together. So while Your Honor's recitation of KSR is certainly correct and is the law that we follow, you need to do more than just simply cite the case if you're the PTAP. You must point to evidence. You must point to this. They very much belittle, oh, you just stick it. I think he even said just stick it on. It's not just sticking it on. This took months, if not years. We don't review opinions. We review judgments. And their judgment was taking all things into account. This was an obvious thing to do. So the question is on the evidence and the facts and given our standard of review. Well, the only point I would make on that, Your Honor, I think it is slightly different with the PTAP. I know there's case law out there. I want to say it's the In Re Sang Su Lee case, which says the board must give a reasoned decision so that this court can properly review it. And my opponent can't come in here and make new arguments to try to bolster because we didn't have an opportunity to argue that at the Patent Office. And if they want to try to make new rejections or come up with a basis for their decision, that's for the Patent Office to go back and do. And then we'll come back up and review that if they get it right. I see I'm well over my time, Your Honor, and I'm cutting into my own mixed arguments. So I will be done if you're done with me. All right. Thank you, counsel.